*Higgins & Associates, Inc.*
*Forensic Engineering Consultants*

September 10, 2007

*16474 Willow Wood Court*
*Morrison, CO 80465*
*(303) 972-4300*
*Fax (303) 972-1134*

Mark W. Nelson, Esq.
Hall & Evans, L.L.C.
1125 17th Street
Denver, CO 80202

Re:   Structural Evaluation
      Jensen Property
      2950 Great Plains Drive
      Grand Junction, Colorado 81503
      Our Job No.: 2737.07

Dear Mr. Nelson:

At your request we have performed a structural evaluation of the Jensen property located at 2950 Great Plains Drive, Grand Junction, Colorado.  It is our understanding the home was built in 2005-2006 and structural distress was identified by Ms. Jensen within one year after final construction.  Upon notification of construction defects identified by the homeowner, the builder performed some repairs; however, several concerns were not addressed and/or repaired.  The purpose of our investigation was to document the observed construction defects at the home and provide general repair recommendations for those defects.

As part of our investigation we conducted a site visit on Thursday, July 19, 2007.  Ms. Gail Jensen, who lives in Las Vegas, Nevada, was unable to meet us at the home but spoke with us by telephone on July 19, and July 21, 2007, to discuss the history of the building.  Minor intrusive testing was performed as part of our investigation to determine the type of foundation construction.  Our investigation, in general, focused on areas of distress disclosed by the homeowner and additional areas of the structure that were accessible for inspection.  Photographs taken during our site visit have been included under Exhibit 9 and are considered ancillary to the written portions of this report.

We were not permitted access to the northwest and southwest bedrooms during our site visit because the tenants were sleeping and posted a notice on the door requesting that they not be disturbed.  Similarly, a vehicle parked in the garage prevented us from accessing the attic space during our site visit.  It was reported that construction defects may exist with the plumbing vent stacks, eave ventilation, attic insulation, and duct insulation located within the attic space.  We anticipate returning to the home in the future to evaluate the construction in those areas.  We will supplement this report with our findings.

EXHIBIT
**3**

## Background

The Jensen property is a one-story timber-framed structure that faces south. The structure is approximately 1,700 square feet in area with an unfinished walkout basement that is approximately 1,700 square feet in area. The house has a 518-square foot attached two-car garage on the southeast corner of the structure. The first floor framing consists of manufactured wooden I-joists. The exterior finishes of the home include brick veneer, exterior insulating finish system (EIFS), and an asphalt composition roofing system.

On the north side of the home at the first floor level is an approximate 200-square foot wooden deck. There is a concrete slab-on-grade patio at the walkout basement level. The lot slopes from the southwest to the northeast. The adjacent undeveloped hillside to the southwest slopes toward the Jensen property. Due to her concerns with improper grading, erosion, and an improper foundation, Ms. Jensen elected not to install landscaping or landscaping irrigation plumbing until these issues have been addressed. At the time of our site visit the exterior landscaping consisted of exposed soils with a minor accumulation of weeds. With the exception of some erosion, the exterior grading was reportedly what was provided by the builder.

The home was constructed in 2005 to 2006 by Famfirst Home Builders, Inc. of Grand Junction, Colorado after relocating to Colorado from Nevada, Ms. Jensen is the original owner of the home and purchased it for $267,500 in February 2006. Ms. Jensen stated she had planned to retire in Grand Junction; however, upon discovery of several-construction related problems, she moved back to Nevada and resumed working to help cover the unexpected costs incurred as a result of her attempts to resolve the construction defects.

At the time the Jensen property was constructed the Mesa County Building Department had adopted the 2000 International Residential Building Code. After Ms. Jensen purchased the home the builder reportedly returned to modify the exterior grading, the interior basement concrete slab, and the basement partition walls. Ms. Jensen also stated the builder rehung doors that became severely racked in the frame and patched numerous drywall cracks throughout the home that were up to 1/8 inch wide. At the time this report was issued, Ms. Jensen stated doors that had been previously repaired no longer closed and/or unlatched.

It is our understanding that although the builder attempted to perform some repairs, Ms. Jensen was unsatisfied with the repairs and the documentation regarding the repair work. It is further our understanding Ms. Jensen and her attorney sought a professional engineer to review the structure to develop an independent assessment of the present damage and/or construction defects.

Documents Reviewed

During our investigation we reviewed the following documents, which were obtained by our office or were provided to our office by Hall & Evans, LLC:

- Final Subsurface Soils Exploration prepared by Edward Morris, P.E. of Lincoln DeVore dated February 20, 2003

- Architectural, structural, and plumbing plans for 2950 Great Plains Drive prepared by Ridemore Enterprises, Inc. dated May 6, 2005. Structural plans are stamped by Joseph P. Foster, P.E.

- Home inspection report prepared by Mr. John Schumacher of Residential Commercial Inspections dated May 18, 2006

- Site and Structure Evaluation of the Jensen Property prepared by Edward Morris, P.E. of Lincoln DeVore dated June 26, 2006

- Mesa County Assessor Parcel Report dated June 21, 2006

A telephone call placed to the Mesa County Building Department revealed they had, in accordance with their policy, disposed of the construction documents pertaining to the Jensen property. Although the Mesa County Building Department has currently adopted the 2006 International Residential Building Code, they stated the 2000 International Residential Code (IRC) was adopted and would have governed the construction of the Jensen home. As part of our investigation we spoke with Mr. John Byerly, a plans examiner for the Mesa County Building Department on August 21, 2007.


Findings

Review of the soils report for the Red Tail Ridge Subdivision authored by Lincoln DeVore on February 20, 2003, revealed it was prepared to provide general subsurface conditions for the development. Lincoln DeVore states they drilled a total of four test borings (page 4) over the entire site for 39 residential lots; however, their bore log indicates they drilled seven test holes. To our knowledge a test boring was not drilled on the Jensen lot (No. 11); however, test borings were drilled on Lots 5 (Testing Boring No. 3) and Lot 2 (Test Boring No. 1) which are located to the north and south of the Jensen property. The Lincoln DeVore geotechnical report dated February 20, 2003, has been included under Exhibit 7.

Regarding the Jensen property, the June 26, 2006 Lincoln DeVore report states that,

> "The foundation soils could not be observed without excavating. Based upon the limited subsurface exploration that was preformed for this subdivision, adjusting for the perceived regrading on this lot, it is believed that the north basement wall is probably 5 to 7 feet above the weathered Mancos Shale Formation and the south basement wall, particularly at the southwest corner, maybe within 1 to 2 feet of the weathered Mancos Shale Formation. The Mancos Shale Formation is considered to be expansive. It is our understanding that a structural fill has been placed beneath this building or at least beneath the foundation components."

According to the February 20, 2003 Lincoln DeVore report, soil samples were obtained with a standard split-spoon sampler, thin-wall Shelby tubes, and by bulk method. Therefore all swell/consolidation tests conducted on soil samples obtained during drilling were on remolded samples. The maximum depth of drilling ranged from 9 to 14 feet.

A soil sample obtained at 8 feet below grade in Test Boring No. 1 exhibited a swell of 6.8 percent when remolded in the laboratory. A remolded soil sample obtained from Test Boring No. 3 exhibited up to 2.55 percent consolidation under an applied pressure of 4,100 pounds per square foot (psf). A swell potential of 3.9 percent was reported for the Type II soil sample obtained from other boreholes. Page 5 of the Lincoln DeVore report states the Type II soil discovered at the site is sensitive to changes in moisture content and will tend to expand when wetted and consolidate upon excessive loading. The Type II soils were to have a minimum dead load and maximum dead design criteria if spread footings were to be used.

According to the Lincoln DeVore report, if the soils encountered during the foundation excavation were relatively dry and medium-dense, the minimum foundation design dead load was to be 1,500 psf. However, if the soils encountered during the foundation excavation were loose, they were to be excavated, reworked, and compacted. If the loose soils were excavated, reworked, and compacted, the maximum foundation design bearing capacity was to be 1,800 psf. From our design experience, a minimum dead load of 1,500 psf and a maximum total load of 1,800 psf are not attainable for residential structures. The report also states that the soil was found to contain sulfates in detrimental quantities, which means a special type of Portland cement was required in the concrete mixes to prevent sulfate attack and deterioration of the concrete.

As previously noted, the June 26, 2006 Lincoln DeVore report indicated that,

> "it is believed that the north basement wall is probably 5 to 7 feet above the weathered Mancos Shale Formation and the south basement wall, particularly at the southwest corner, maybe within 1 to 2 feet of the weathered Mancos Shale Formation."

The Mancos Shale Formation was reported as being very sensitive to changes in moisture content and the soils would likely expand upon wetting. The one test performed on remolded soil from the Mancos Shale Formation generated a swell potential of 6.8 percent with an associated swell pressure of 2,774 psf (page 6). Where the Mancos Shale Formation was present, the minimum foundation design dead load was to be 1,700 psf (page 6).

The Lincoln DeVore report also states up to 1/4-inch thick seams of sulfate salt deposits exist within the Mancos Shale Formation. Lincoln DeVore stated the sulfate salt deposits could become dissolved upon wetting leaving significant amounts of void in the formation, which could affect the load-bearing capacity of the formation (page 7).

Our review of the Lincoln DeVore report dated February 20, 2003, revealed that they recommended structural fill located beneath structures be compacted to only 90 percent of its maximum modified Proctor dry density (page 10). Typically soils beneath structures are required to be compacted to 95 to 100 percent of their maximum modified Proctor density within 2 percent of the optimum moisture content. A density of only 90 percent of the maximum modified Proctor dry density could result in consolidation and unacceptable structural settlement.

On page 10 of their report, Lincoln DeVore states no puddling techniques of any type should be used in the placement of fill at the site; however, on page 18 of the report it states it may be appropriate to extensively soak the over-excavated portion of the site for at least two days and up to seven days prior to the installation of the perimeter drain and the structural fill. Generally, the excavation "soaking" technique outlined by Lincoln DeVore is not recommended in Colorado.

The Lincoln DeVore boring location diagram dated February 20, 2003, indicates a "General area of wet soil and 'high water table.'" The Jensen property is located within the shaded area identified as having a high water table. The Lincoln DeVore report recommends the use of foundation drains several times in the report; however, a perimeter drain was not installed at the Jensen residence. In their discussion regarding basement retaining walls, the Lincoln DeVore report states drainage behind retaining walls is critical and they recommend the use of a drain behind impermeable retaining walls to prevent excessive lateral earth pressures.

The Lincoln DeVore report provides recommendations for three types of foundations (continuous strip footing, interrupted pad, and drilled pier) and several types earthwork but does not clearly outline what foundation system should be used for each lot based upon soil conditions. Rather, the report indicates that further testing would be required prior to or during the construction phase to determine what foundation type would be required and/or what soil stability measures would be necessary. On Pages 9 and 11 of their report Lincoln DeVore states periodic inspections, testing, and open pit excavation should be performed at each home site by their office prior to placing forms or pouring concrete. According to Lincoln DeVore's June 26, 2006 letter they were not asked by the builder to perform the required inspections.

The Lincoln DeVore report provides recommendations for three types of basement floor construction including structural floor, concrete slab over a 2-foot thick layer of structural fill, and concrete slab-on-grade over the native soils. On Page 20 of their report it states that if concrete slab-on-grade over the native soils is used, a slab heave of 1 to 3 inches is expected. Our shallow excavations and limited observation of the soils placed beneath the basement and garage concrete slab-on-grade indicated a 2-foot thick layer of structural fill was not placed beneath the concrete slabs; however, we recommend this be confirmed by additional testing.

Since a foundation perimeter drain was not installed as outlined, required, and specified by the geotechnical engineer under the option describing the requirements for a home bearing on 2 feet of structural fill, we believe the home and the slab-on-grade construction may be on the native soils. As described by Lincoln DeVore, soil heave of 1 to 3 inches is expected for these slabs. In the case where the concrete slab is structurally fastened to the foundation, this could be detrimental to the structure if the underlying soils heave. Our observation of the interior of home revealed negligible distress attributable due to vertical foundation movement; however, Ms. Jensen stated the builder had recently completed cosmetic repairs include patching of drywall cracks. The distress that was present prior to the repairs, as described by Ms. Jensen, was indicative of vertical foundation movement.

In their report dated June 26, 2006, Lincoln DeVore expresses their belief that the foundation elements are within 1 to 2 feet of the expansive Mancos Shale. Lincoln DeVore also expresses concern that the soil inspections were performed by a geologist and not a Colorado licensed engineer (page 3). Lincoln DeVore also comments that the foundation was not constructed to meet frost depth but the soils may be a low to non-frost susceptible type (page 3). On page 4 of their report Lincoln DeVore states the following:

"This construction has a number of items which raise questions regarding reasonable compliance with the foundation design.  We do have a concern that the site, as currently graded, is nearly impossible to landscape in a manner that meets the drainage and gradient recommendations without resorting to extraordinary means.  There is no indication or evidence that a subsurface drain, either a foundation perimeter drain or a barrier-type drain, has been constructed on this site."

Lincoln DeVore further states they recommend a perimeter foundation drain be constructed at the home (page 5).  We have included the Lincoln DeVore report dated June 26, 2006, under Exhibit 8.  It is our opinion the February 20, 2003 soils report by Lincoln DeVore fell below the standard of care for a geotechnical engineer for the following reasons:

A.  An inadequate number of bore holes were drilled to adequately define the soil conditions across the site and on each specific lot.

B.  The bore holes drilled were not drilled deep enough to provide the required information for a deep foundation, which was an option provided by the geotechnical engineer.

C.  An inadequate number of swell/consolidation tests were conducted to define the heave and/or settlement potential of the soil and bedrock under design loads.

D.  The soils report does not provide tangible engineering criteria for which type of foundation should be used on each lot for the respective soil conditions.  Therefore, the wrong foundations could likely have been constructed for the actual conditions.

E.  The compaction requirements specified under the spread-footing foundations could result in settlement in excess of 1 inch.

It is our opinion there are several defects in the design and construction of the Jensen property that have caused structural damage, are likely to manifest in damage in the future, do not comply with the building code, do not comply with the engineer consultant's recommendations, and/or are prone to premature deterioration and increased maintenance.  Presently, additional information is required regarding the subsurface geotechnical conditions to develop a complete set of drawings and specifications for the repair of the home.

Although additional testing is needed to develop the construction design details to finalize our repair recommendations, the expenses associated with testing may be unnecessary if the builder is willing or able to supply the required information.  We have listed what documentation is needed from the builder below.  However, at a minimum we recommend that the site be drilled by a competent geotechnical engineer to determine the exact soil conditions that exist on the Jensen lot.

Based upon our observation of the home and review of the documents available we have developed the following list of design and construction defects.  Following each item we have provided a description of the item and a general repair recommendation.  The repair recommendations listed below are not sufficient in detail for construction since additional testing and documentation has been requested.  Similarly, the list is not considered final since our investigation is ongoing.

## 1.    Deficient grading

The grading installed by the builder is relatively flat and does not meet the minimum specifications of the 2000 International Residential Code (IRC) and the Lincoln DeVore report recommendations.  Similarly the soils were placed at the same elevation as the bottom of the exterior wall wooden framing.  According to the 2000 IRC, Section R323, Protection Against Decay:

> "R323.1.1 Ground Contact.  All wood in contact with the ground and that supports permanent structures intended for human occupancy shall be approved pressure preservatively treated wood suitable for ground contact use, except untreated wood may be used where entirely below groundwater level or continuously submerged in fresh water."

According to the 2000 IRC, Section R404, Foundation Walls:

> "R404.1.6 Height above finished grade.  Concrete and masonry foundation walls shall extend above the finished grade adjacent to the foundation at all points a minimum of 4 inches (102 mm) where masonry veneer is used and a minimum of 6 inches elsewhere."

Since the wall framing is not pressure treated, the 2000 IRC requires the wood framing to be elevated a minimum of 8 inches above the soil.  According to the 2000 IRC, Chapter 4 Foundations, Section R401, General:

> "R401.3 Drainage. Surface drainage shall be diverted to a storm sewer conveyance or other approved point of collection so as to not create a hazard. Lots shall be graded to drain surface water away from foundation walls. The grade shall fall a minimum of 6 inches (152 mm) within the first 10 feet (3048 mm)."

According to the Lincoln DeVore report dated February 20, 2003:

> "Adequate site drainage should be provided in the foundation areas both during and after construction to prevent the ponding of water and the wetting or saturation of the subsurface soils.  We recommend that the ground surface around the structures be graded so that surface water will be carried quickly away from the buildings.  The minimum gradient within 10 feet of the buildings will depend on surface landscaping.  We recommend that paved areas maintain a minimum gradient of 2%, and that landscaped areas maintain a minimum gradient of 8%.  It is further our recommendation that roof drain downspouts be carried at least 18 feet beyond all backfilled areas and discharged a minimum of 15 feet away from the structure.  Proper discharge of roof drain downspouts may require the use of subsurface piping in some areas."

The exterior grading as installed does not provide the code-required 8 inches of clearance between the wood framing and the adjacent grade along the north and south sides of the home.  Similarly, the minimum of 6 inches of fall was not provided as required nor was the 8 percent minimum (10 inches in the first 10 feet) slope specified by the geotechnical report provided.

Ms. Jensen stated she was aware the exterior grading did not meet the building code since the present landscaping grades created 8- to 12-foot diameter ponds during precipitation events that nearly backed up into her basement.  She stated she intentionally did not install landscaping because the grading was incorrect.  Since landscaping has not been installed, the exposed soils have formed erosion channels.

*Recommendation:*  We recommend the lot be regraded to comply with the building code and the geotechnical report.  We also recommend the erosion channels be repaired by the builder.  Since the footings along the north side of the home extend only 8 inches below grade, another defect will be made worse by providing the code-required earth and wood separation.  This issue is discussed under item 34 below.

## 2.   Blocked exterior drainage

As previously mentioned, the undeveloped hillside located adjacent to the southwest side of the Jensen property slopes toward the home.  Surface runoff is collected by a graded swale located in the front yard that slopes toward the east side of the lot.  The swale is dammed/blocked by the concrete slab-on-grade driveway.  The driveway allows the water to pond in the front yard until the moisture overtops the concrete and runs across the driveway slab.  Once over the driveway slab the drainage is allowed to flow onto the backfill of the adjacent building.  Diverting surface runoff across the exterior flatwork can cause ice to form during the winter months, which creates a slip and fall hazard.

Similarly, a roof gutter downspout was terminated adjacent to the south foundation wall where it places roof drainage onto the surface of the front walkway and the driveway.  Placing roof drainage on the front walkway can cause ice to form during the winter months, which creates a slip and fall hazard.

According to the Lincoln DeVore report dated February 20, 2003:

> "We recommend the water be drained away from structures as rapidly as possible and not be allowed to stand or pond near the building.  We recommend that water removed from one building not be directed onto the backfill areas of adjacent buildings."

*Recommendation:* We recommend a chase be installed in the front walkway that is oriented perpendicular to the foundation wall to convey roof drainage to the front yard.  We further recommend a chase be installed in the front driveway to allow for unimpeded drainage from the swale to the southeast corner of the lot.  Once at the east side of the driveway a swale will need to be cut into the grading to prevent surface drainage from flowing toward the neighbor's foundation.  We recommend that the site drainage plans be reviewed to determine the size of the chases and where the swales were to be terminated.  Both chases should be constructed with a removable cover rated for vehicle loading and pedestrian traffic.

## 3.   Missing foundation pad at front porch

As shown in Photograph 3 included under Exhibit 9, the design of the roof structure incorporated a load-bearing roof beam along the west side of the front porch.  The load-bearing beam is supported by an isolated load-bearing column.  Sheet S-1 of the foundation plans prepared by Ridgemore Enterprises, Inc. shows that a foundation element was not provided beneath this column.

During our site visit we observed that the load-bearing roof column was supported by the concrete slab-on-grade front porch. We further observed that the porch had settled 1/2 inch. Settlement of the front porch slab has caused the load-bearing roof column to no longer be vertically supported. As shown in Photographs 8 and 9 under Exhibit 9, the column is loose and can be moved laterally by applying minimal force by hand.

*Recommendation:* We recommend an engineered foundation be installed beneath this column. Since the column is located over the foundation backfill, a shallow foundation pad cannot be used due to the high probability of future settlement. It is likely the front porch will have to be removed to facilitate the installation of the new footing. If additional geotechnical testing reveals that a spread footing foundation is an acceptable foundation type, the footing will have to be constructed a minimum of 8 feet below grade to extend below the zone of backfill. If a deep foundation is warranted, the load-bearing column may be supported by a single pier and a concrete pier cap.

## 4.      Improper isolation of garage brick veneer and garage door jambs

As previously discussed, according to the Lincoln DeVore report concrete slabs-on-grade are expected to heave 1 to 3 inches. As constructed, the concrete slab-on-grade installed on either side of the driveway was placed beneath the entire bearing width of the 4-inch nominal brick veneer wainscot. Photograph 16 included under Exhibit 9 shows the brick veneer bearing on the non-structural slab. Heave of the concrete slab-on-grade driveway will lift up on the garage brick veneer and cause distress and potentially structural damage.

Photograph 16 included under Exhibit 9 shows the overhead garage door jambs were not structurally isolated from the garage and driveway slabs. Heave of the concrete slab-on-grade driveway and garage will lift up on the garage overhead garage door jambs and cause distress and potentially structural damage.

*Recommendation:* We recommend the concrete driveway be sawcut at the nearest control joint and reinstalled to incorporate void form material beneath the brick. Since it is our opinion the garage foundation is improper, repairs discussed under Item 35 will make this a moot point. The garage door jambs should also be cut off to provide a minimum 1/2 inch clear space between wood and concrete.

**EIFS Defects**

During our site visit we observed several construction details that do not comply with the recommendations of most EIFS manufacturers. Specifically we observed the following:

- The Portland cement-based finish coat was screeded to the aluminum trim. Since Portland cement and aluminum react, the two materials dissimilar should be isolated. It is commonly recommended that isolation joints constructed with backer rod and sealant be constructed around window and door openings.

- Several EIFS penetrations are not caulked.

- The rear deck wooden guardrail is embedded in the EIFS, which renders the wood prone to decay and represents an unsealed penetration in the cladding.

- EIFS control joints were not observed. In general, control joints are governed by the following:

  o Monolithic wall areas should not exceed 144 square feet.

  o Dimensions between horizontal or vertical control joints should not exceed 12 feet.

  o Control joints should be installed between floors at the rim joist.

  o The length-to-width ratio of areas should not exceed 2-1/2 to 1.

  o At high stress areas such as corners of windows, doors, and other penetrations control joints are required.

*Recommendation:* We recommend the aforementioned deficiencies be addressed/repaired; however, to develop specific repair recommendations we request that the EIFS manufacturer be identified. Should the owner request, Higgins & Associates can perform intrusive testing to investigate the method of EIFS installation including concealed flashings.

## 5.   Improper slope of the brick rowlock and metal flashing.

As shown in Photographs 12 and 13 included under Exhibit 9, the brick sill/rowlock course on top of the south wainscot is flat to negatively sloped toward the wall cavity.  Similarly, the metal flashing was neither sloped away from the wall nor sealed toward the brick.  Drainage/weeps were not installed along the bottom of the wall.  According to the Brick Industry Association (BIA) Technical Notes 7 - Water Penetration Resistance Design and Detailing:

> "Projections, Recesses and Caps. Projections, recesses and caps tend to collect rain water and snow. They should be sloped away from the wall to drain and be flashed where possible as shown in Figure 16. Other details and information can be found in the Technical Notes 36 Series."

According to the Brick Industry Association (BIA) Technical Notes 36 - Brick Masonry Details, Sills, and Soffits Reissued Jan. 1988:

> "Since the primary function of sills is to divert water away from the building, the top surface should slope downward and away from the building. In the case of brick sills, see Figures 3 and 4, the slope should be at least 15 deg from horizontal. This may vary somewhat according to the sill configuration of the window unit, particularly in the case of wood windows. The sill should extend a minimum of 1 in. (25 mm) beyond the face of the wall at its closest point to the wall, see Fig. 3.

It is our opinion that as built, the brick rowlock course can drain moisture into the wall cavity where it can become trapped and deteriorate the wooden wall framing.

*Recommendation:*  We recommend the sill rowlock course be removed and reinstalled to slope toward the outside at a minimum slope of 15 degrees.  We further recommend the metal flashing be reinstalled to be sealed to the brick and slope toward the exterior at a minimum slope of 15 degrees.  We anticipate that the EIFS will have to be cut back and reinstalled along this surface in order to reinstall the metal flashing and provide the required slope on the brick.

### 6.     South-facing window not sealed to brick

As shown in Photograph 14 included under Exhibit 9, the brick veneer was not sealed to the vinyl windows.  Presently precipitation can enter the cavity behind the brick veneer where it can become trapped inside the wall and deteriorate the wooden framing.

*Recommendation:*  We recommend all unsealed joints be sealed with a closed cell backer rod and sealant.

### 7.     Missing gable vent

Architectural Sheet 3 dated May 6, 2005, states "There shall be a functional gable vent on the south side of the garage."  This functional gable vent was not installed.

*Recommendation:*  We recommend a functional gable vent be installed on the south-facing attic gable wall above the overhead garage doors.

### 8.     Improper slope of foundation footing flashing

As shown in Photograph 27 included under Exhibit 9, metal flashing was installed over the exposed outside projection of the foundation footing.  The metal flashing is sloped toward the exterior wall of the home and does not promote drainage away from the structure.  As shown in Photograph 27 included under Exhibit 9, the metal flashing is corroding.  The metal flashing should be sloped away from the exterior wall at a minimum pitch of 15 degrees.

*Recommendation:*  We recommend the flashing be reconfigured to drain away from the exterior wall at a minimum slope of 15 degrees; however, repairs listed under Item 34 will make the metal flashing a moot point.

### 9.     Broken fence gate

At the time of our site visit the wooden fence gate positioned on the west side of the home was broken off the adjacent fence line and was lying on the ground. Similarly, the metal window well at the adjacent basement window was bent/dented.  Ms. Jensen indicated the builder damaged the window well when they attempted to regrade the backyard to eliminate the ponding water.  We also observed the corrugated metal window wells were not attached to the concrete foundation wall at the manufacturer-designated points of attachment.

*Recommendation:* We recommend the damaged fence gate and window well be repaired/replaced. We further recommend the window wells be attached to the foundation wall with powder actuated fasteners.

## 10.   Exposed basement window nailing flange

As shown in Photograph 19 included under Exhibit 9, the vinyl basement window nailing flange was fastened to the cast-in-place wooden foundation buck. The vinyl nailing flange and concrete were coated with the same material as the EIFS finish coat; however, the window flange was not sealed. As manufactured, the window frame is designed to be incorporated in a layered fashion into the wooden framing, weather resistive barrier, exterior cladding, and perimeter sealants. Presently, moisture can seep into the nailing flange seam and into the basement.

*Recommendation:* We recommend either the window type be changed to be recessed within the opening or the exterior wall cladding system be extended down to properly seal the perimeter of the window.

## 11.   Wooden deck support columns improperly supported

During our site visit we observed that some of the wooden 4 by 4 deck columns were in contact with the soil while others were buried in soil. According to the 2000 IRC, Chapter 3 Building and Planning, Section R323 Protection Against Decay:

> "R323.1.3 Posts, poles and columns. Posts, poles and columns supporting permanent structures that are embedded in concrete in direct contact with the ground or embedded in concrete exposed to weather shall be approved pressure preservatively treated wood suitable for ground contact use.

> "R323.1.4 Wood columns. Wood columns shall be approved wood of natural decay resistance or approved pressure-preservative treated wood.

>> "Exception: Posts or columns supported by piers or metal pedestals projecting 1 inch (25.4 mm) above the floor or finish grade and are separated therefrom by an approved impervious moisture barrier."

Since the 4 by 4 posts are not pressure treated or are constructed of a species rated for ground contact, the columns should be elevated a minimum of 8 inches above the soil.  Under Exhibit 3 we have included a copy of the Mesa County Building Department building guide for the construction of residential uncovered decks and porches.  Page 3 of the guide states the bottom of the wooden columns should be elevated 8 inches minimum above grade.  Page 2 of the same guide states the footings should extend a minimum of 36 inches below grade.  The purpose of the 36-inch depth is to structurally support the imposed load on the column through side shear in the soil.

As part of our investigation we excavated one of the concrete foundation supports.  As shown in Photographs 68 and 69 included under Exhibit 9, the piers were not constructed with an 8-inch diameter concrete pier that extended 36 inches below grade.  The measured depth was approximately 12 inches.

*Recommendation:*  We recommend the deck support columns be removed and replaced with new deck columns that comply with the building code, the geotechnical report, and the Mesa County Building Department building guide for the construction of residential uncovered decks and porches.  There are eight total deck support columns.

## 12.   Erosion beneath the rear basement patio slab.

As shown in Photograph 30 included under Exhibit 9, erosion and soil settlement has created a void beneath the concrete slab-on-grade patio.

*Recommendation:*  We recommend the patio slab be mud-jacked to eliminate any voids beneath the slab; however, repairs listed under Item 34 will make the void a moot point since the slab ultimately will have to be replaced to repair the foundation.

## 13.    Inadequate bolting of the wooden deck ledger.

We observed that the rear wooden deck ledger was fastened to the first floor rim joist with 16-penny nails and 1/2-inch diameter bolts spaced at 32 inches center to center.  According to the 2000 IRC, Chapter 5, Floors, Section R502 Wood Floor Framing:

> "R502.2.2.1 Decks. Where supported by attachment to an exterior wall, decks shall be positively anchored to the primary structure and designed for both vertical and lateral loads as applicable. Such attachment shall not be accomplished by the use of toenails or nails subject to withdrawal. Where positive connection to the primary building structure cannot be verified during inspection, decks shall be self supporting.  For decks with cantilevered framing members, connections to exterior walls or other framing members, shall be designed and constructed to resist uplift resulting from the full live load specified in Table R301.4 acting on the cantilevered portion of the deck."

Our calculations indicate the installed attachments are not structurally adequate to attach the ledger to the first floor rim joist for the code-required loading.  We also observed that metal ledger flashing was installed over the top surface of the decking boards.  Per industry standards and the Mesa County Building Department building guide for the construction of residential uncovered decks and porches (Detail A on Page 3) the ledger flashing should be installed below the decking boards.  Under Exhibit 3 we have included a copy of the Mesa County Building Department building guide for the construction of residential uncovered decks and porches.

*Recommendation:*  We recommend the existing deck ledger be attached to the first floor rim joist with a minimum of two rows of 3/8-inch diameter by 5-inch long lag bolts spaced at 16 inches center to center.  One new 3/8-inch diameter bolt may be eliminated for each 1/2-inch bolt presently installed.   We further recommend the horizontal leg of the existing metal flashing be caulked/sealed to the surface of the wooden deck and the interface between the underside of the wooden decking boards and the ledger be caulked/sealed.

## 14.   Unsloped garage slab

We observed that the garage floor was flat and does not slope toward the overhead door.  As constructed, water on the surface of the garage slab can flow laterally into the exterior wall framing.  It is standard practice to slope garage floors toward the overhead door at a pitch of at least 1/8 inch per foot and to place the garage slab a minimum of the amount of predicted slab heave (which is 3 inches for the Jensen property) lower than the foundation stem wall so that slab heave will not create a situation where the slab is higher than the wall framing.  According to the 2000 IRC, Chapter 3 Building and Planning, Section R309 Garages and Carports:

> "R309.3 Floor surface. Garage floor surfaces shall be of approved noncombustible material.
>
> "The area of floor used for parking of automobiles or other vehicles shall be sloped to facilitate the movement of liquids to a drain or toward the main vehicle entry doorway."

*Recommendation:*  We recommend the garage slab be removed and replaced to sit 3 inches lower than the exterior wall framing and slope toward the overhead door; however, repairs listed under Item 35 will make the garage slab repair a moot point.

## 15.   The underside of the basement stairs is not protected with gypsum wallboard.

During our site visit we observed that the partially-enclosed underside of the wooden basement stairs was exposed and had not been provided with a fire-protective membrane.  According to the 2000 IRC, Chapter 3 Building and Planning, Section R314 Stairways:

> "R314.8 Under stair protection.  Enclosed accessible space under stairs shall have walls, under stair surface and any soffits protected on the enclosed site with 1/2-inch (12.7 mm) gypsum board."

*Recommendation:*  We recommend 1/2-inch thick gypsum board be installed on the underside of the basement stair framing to provide the code-required fire protection.

## 16.   Load-bearing wall removed in basement

The structural and architectural drawings specify a load-bearing wall to be constructed within the basement beneath the kitchen at the east end of the wall.  The purpose of the load-bearing wall was to support the first floor joists near midspan.

According to Ms. Jensen, the builder returned to the home a few months prior to our site visit to undercut the load-bearing basement wall to isolate the wooden framing from the slab, which bears on expansive soils.  At the time of our site visit the load-bearing wall within the basement had been undercut to provide the 1-1/2-inch float specified by the geotechnical report and the Mesa County Building Department; however, a structural steel beam had not been installed to support the floor joists along the former load-bearing wall.

Per the manufacturer's literature and the building code Evaluation Report ESR-1336, the 9-1/2-inch deep Boise Cascade 450 floor joists, which are spaced at 19.2 inches center to center, have a maximum safe permissible span of 16 feet, 10 inches.   With the load bearing wall removed, the joists span 18 feet, 8-1/2 inches.

*Recommendation:*  We recommend a new 8-inch deep steel beam be installed along the former load-bearing wall to structurally support the first floor joists. The east end of the new steel beam can be bolted to the face of the foundation wall.  The south end of the new steel beam should be supported by a new column and foundation element.

## 17.   Missing joist cantilever blocking

We observed that twist/freeze blocking was not installed where the first floor wooden I-joists cantilever over the south foundation wall at the south bedrooms.  Standard framing practices and the joist manufacturer requires twist/freeze blocking be installed wherever joists are cantilevered.  Under Exhibit 6 we have included the joist manufacturer's standard framing details that show how blocking should be installed at cantilevered members.  Sheet S3 of the original structural drawings also specify "solid block over foundation wall" and identify the blocking graphically and with an arrow pointing to the blocking.  The 2000 IRC also specifies that cantilevered floor joists should be solid blocked at the points of support.

*Recommendation:*  We recommend the required BCI 450 twist/freeze blocking be installed at the south framing cantilever.

## 18.    Missing wooden nailer on first floor framing steel beam

As shown in Photographs 54 and 55 included under Exhibit 9, the wooden BCI 450 I-joists were set on a 1/8-inch thick ply of polyisocyanurate foam, which was laid on the first floor steel beam. As built, the first floor I-joists are not structurally attached to the first floor I-beam support. The lack of structural attachment between the steel beam, and the floor joists is unacceptable for the following reasons:

- The bottom flange of the first floor joists is in compression where it passes over the steel beam. Lateral support of the compression flange is required to prevent lateral torsional buckling of the joists.

- Under Exhibit 6 we have included the joist manufacturer's standard framing details that show that the bottom flange of the joists are required to be structurally fastened to a wooden nailer that is structurally fastened to the steel beam.

- The top flange of the first floor steel beam is the compression flange for most of the span between the columns. Lateral support of the compression flange is required to prevent lateral torsional buckling of the steel beam. The lateral support is obtained by a structural attachment to the first floor joists.

- It is structurally required to provide a positive connection between the various pieces that comprise a structure. Presently the wood columns are not fastened to the slab or the steel beam, and the steel beam is not attached to the first floor framing joists. The global stability of the framing could be compromised in the event of a design event such as an earthquake, windstorm, or heavy loading on the first floor level of the home.

- The first floor framing may be more prone to floor squeaks without being secured to a wooden nailer.

*Recommendation:* We recommend temporary shoring be installed to allow the first floor steel beam be lowered and a wooden 2 by 6 nailer installed. The new wooden nailer should be fastened to the steel beam with powder-actuated fasteners spaced at 16 inches center to center. The joists should be fastened to the new nailer per the manufacturer's recommendations after the beam is reinstalled.

**19.   Improperly cut first floor joists.**

Two first-floor framing joists were improperly cut near the first floor steel beam near the northwest corner of the basement.   The wooden I-joists were cut without installing a header to transfer the load to the adjacent framing and foundation wall.   The cut joists are shown in Photograph 47 included under Exhibit 9.

*Recommendation:*  We recommend a header be constructed to structurally support the cut end of the first floor framing.   The installation of a header will require rerouting of mechanical ducts.

**20.   Beam pockets not grouted**

The first floor steel beam pockets were not grouted solid.   The building code requires that the ends of steel beams be structurally secured against rotation. In typical residential construction the bracing is accomplished by grouting the beam pockets solid.   Presently the first floor steel beams are set on a loose and unsecured stack of steel shims, which could become unstable in the event of seismic loading or vibrations.

*Recommendation:*  We recommend the beam pockets be grouted solid.

**21.   Improper basement wood support columns**

Within the basement there are five built-up wooden columns that bear on the concrete slab-on-grade that support the first floor steel beams.   The built-up wooden columns are not decay resistant nor are they elevated above the floor slab with a pedestal.   The wooden columns are also not structurally attached to the first floor framing.   According to the 2000 IRC, Chapter 3 Building and Planning, Section R323 Protection Against Decay:

> "R323.1.4 Wood columns. Wood columns shall be approved wood of natural decay resistance or approved pressure-preservative treated wood.
>
> > "Exception: Posts or columns supported by piers or metal pedestals projecting 1 inch (25.4 mm) above the floor or finish grade and are separated therefrom by an approved impervious moisture barrier."

According to the 2006 IRC, Chapter 3 Building and Planning, Section R319 Protection Against Decay:

> "R319.1.4 Wood columns. Wood columns shall be approved wood of natural decay resistance or approved pressure-preservative- treated wood. Exceptions:
>
>> "1. Columns exposed to the weather or in basements when supported by concrete piers or metal pedestals projecting 1 inch (25.4 mm) above a concrete floor or 6 inches (152 mm) above exposed earth and the earth is covered by an approved impervious moisture barrier.
>>
>> "2. Columns in enclosed crawl spaces or unexcavated areas located within the periphery of the building when supported by a concrete pier or metal pedestal at a height more than 8 inches (203mm) from exposed earth and the earth is covered by an impervious moisture barrier."

According to the aforementioned section of the building code the columns are not required to be pressure treated when located in a basement as long as they are on a concrete pier or metal pedestal that elevates them a minimum of 1 inch above the floor.  As shown in Photographs 59 and 60 included under Exhibit 9, the wooden columns are not pressure treated nor structurally attached to the slab nor structurally attached to the steel beam.

*Recommendation:*  We recommend the wooden columns be replaced with new adjustable steel columns that are structurally fastened to the foundation and to the steel beam.  As discussed under Item 33, new foundation elements will be required to support the new monoposts.

## 22.    Missing foundation perimeter drain and sump pit

Review of the Lincoln DeVore soils report dated February 20, 2003, indicates that the Jensen residence is located in an area with a high water table. Similarly, the Lincoln DeVore report states that the soils underlying the Jensen property are highly sensitive to changes in moisture content.  The report further indicates the underlying soils are not free-draining and are susceptible to a perched water table condition.  In their June 26, 2006 report, Lincoln DeVore recommends a foundation perimeter drain be installed at the Jensen property.

According to the 2000 IRC, Chapter 4 Foundations, Section R405 Foundation Drainage:

> "R405.1 Concrete or masonry foundations. Drains shall be provided around all concrete or masonry foundations that retain earth and enclose habitable or usable spaces located below grade. Drainage tiles, gravel or crushed stone drains, perforated pipe or other approved systems or materials shall be installed at or below the area to be protected and shall discharge by gravity or mechanical means into an approved drainage system. Gravel or crushed stone drains shall extend at least 1 foot (305 mm) beyond the outside edge of the footing and 6 inches (152 mm) above the top of the footing and be covered with an approved filter membrane material. The top of open joints of drain tiles shall be protected with strips of building paper, and the drainage tiles or perforated pipe shall be placed on a minimum of 2 inches (51 mm) of washed gravel or crushed rock at least one sieve size larger than the tile joint opening or perforation and covered with not less than 6 inches (152 mm) of the same material.
>
>> "Exception: A drainage system is not required when the foundation is installed on well-drained ground or sand-gravel mixture soils according to the Unified Soil Classification System, Group I Soils, as detailed in Table R405.1."

The geotechnical report does not indicate the Jensen foundation is installed on well-drained ground or sand/gravel mixture soils per the 2000 IRC Table 405.1. It is our opinion a foundation perimeter drain should be installed around the perimeter of the basement and garage.

*Recommendation:* We recommend a new foundation perimeter drain be installed around the perimeter of the basement and garage foundation walls. The construction should be commensurate with the geotechnical report recommendations and Section R405.1 of the 2000 IRC. The new drain should terminate at a new sump pit located at the northwest corner of the basement which discharges to the exterior through a sump pump.

## 23.   Earth and wood separation not maintained at basement window wells

As shown in Photographs 21 and 46 included under Exhibit 9, either the foundation opening was cast too large for the anticipated windows or the installed windows were delivered too small for the foundation opening. As a result, a short wood-framed pony wall was constructed beneath two north-facing basement windows located near the northwest corner of the basement.

Backfill within the window wells buried the wood-framed pony walls below grade. According to the 2000 IRC, Section R323, Protection Against Decay:

> "R323.1.1 Ground Contact. All wood in contact with the ground and that supports permanent structures intended for human occupancy shall be approved pressure preservatively treated wood suitable for ground contact use, except untreated wood may be used where entirely below groundwater level or continuously submerged in fresh water.

According to the 2000 IRC, Section R404, Foundation Walls:

> "R404.1.6 Height above finished grade. Concrete and masonry foundation walls shall extend above the finished grade adjacent to the foundation at all points a minimum of 4 inches (102 mm) where masonry veneer is used and a minimum of 6 inches elsewhere."

Since the wall framing is not pressure treated, the 2000 IRC requires the wood framing to be elevated a minimum of 8 inches above the soil. According to the 2006 IRC, Section R319, Protection Against Decay:

> "R319.1 Location required. Protection from decay shall be provided in the following locations by the use of naturally durable wood or wood that is preservative treated in accordance with AWPA U1 for the species, product, preservative and end use. Preservatives shall be listed in Section 4 of AWPA U1.

> > "2. All wood framing members that rest on concrete or masonry exterior foundation walls and are less than 8 inches (203 mm) from the exposed ground."

*Recommendation:* We recommend the window wells be deepened approximately 16 inches to provide the code-required earth and wood separation. This repair will likely require removal of the existing corrugated metal window wells to allow for the installation of deeper window wells. We recommend a new window well drain be connected to the foundation perimeter drain, if accessible, during the repair.

### 24.   Improperly constructed basement float joint

We observed the basement partitions were originally constructed tight between the first floor framing and the basement floor slab.  Since the basement floor slab will move vertically if the underlying soils heave, both the Mesa County Building Department and the Lincoln DeVore geotechnical report require that the basement partition walls be constructed with a 1-1/2-inch minimum high float joint.  Although the builder returned to the home to establish the float joint, the work had not been completed at the time of our site visit.  We have included a detail of the Mesa County Building Department building guide for finishing basements and a detail of the required float joint under Exhibit 4.

*Recommendation:*  We recommend the basement partition walls be reconstructed to incorporate a 1-1/2-inch minimum high float joint.

### 25.   Inadequate vertical and horizontal foundation steel

Basement walls serve as an earth-retaining function in addition to carrying the vertical load of the home.  For their earth-retaining function, basement walls typically span vertically between the basement slab and the first floor framing.  As designed, the foundation walls do not have sufficient horizontal steel to span laterally between the building corners.  According to the Lincoln DeVore geotechnical report (page 22), basement foundation walls should be designed for a lateral earth pressure of 65 pounds per cubic foot (pcf) equivalent fluid pressure.

According to the foundation design documents and our rebar scans of the foundation walls, the vertical steel for the foundation walls is No. 4 rebar spaced at 4 feet center to center.  Although the structural foundation drawings graphically show the vertical steel on the incorrect face of the foundation walls, our rebar scan of the west foundation wall revealed the vertical steel was placed in approximately the center of the wall.

According to the 2000 IRC, Table R404.1.1(2), when the soil class of SC, MH, ML-CL and inorganic CL soils is used, the vertical steel is required to be No. 6 rebar spaced at 24 inches center to center.  According to the 2006 IRC, Table 1805.5(5), when an equivalent fluid pressure of 60 pcf is used (which is less than the 65 pcf specified),  the vertical steel is required to be No. 6 rebar spaced at 32 inches center to center.  The code-required rebar is more than three times larger than that which was specified by the Ridgemore Enterprises drawings and installed.  Similarly, the specified amount of rebar is less than one-half of the minimum amount of steel specified by the American Concrete Institute (ACI) Building Code Requirements 318-95 Section 14.3.2.   The specified horizontal steel is also less than that specified by ACI 318-95 Section 14.3.3.